IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



SHELLEY FEDERICO, et al.,

     Plaintiffs,

     v.

LINCOLN MILITARY HOUSING,
LLC, et al.,

     Defendants.

CIVIL NOS. 2:12cv80, 2:12cv596,
2:13cv660, 2:13cv661, 2:14cv178

## OPINION AND ORDER

The consolidated cases at issue (2:12cv80, 2:12cv596, 2:13cv660, 2:13cv661, 2:14cv178)[1] involve mold-related contract and tort claims by the Federico family ("Plaintiffs") against the Lincoln Defendants ("Lincoln"), which manage and operate the Tidewater-area military housing communities in which Plaintiffs resided, and TWF Construction ("TWF"), an independent contractor (collectively, all defendants will be referred to as "Defendants.")

The matter is now before the Court on two motions filed by Defendants: (1) a Motion for Judgment on Derivative Sovereign Immunity, ECF No. 428; and (2) a Motion for Summary Judgment, ECF No. 427. For the reasons set forth herein, the Motion for Judgment on Derivative Sovereign Immunity is **DENIED** and the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Unless otherwise noted, all citations will be to the leading case—2:12cv80.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   THE PARTIES

Plaintiffs are husband and wife Joe and Shelley Federico and their minor child, J.F. Plaintiffs leased military housing allegedly affected by mold and bring claims based on violation of the Virginia Residential Landlord and Tenant Act ("VRLTA"), breach of lease, negligence, and negligence *per se*.

Defendants are as follows: (1) Lincoln Property Company ("LPC"); (2) Lincoln Military Housing, LLC ("LMH"); (3) Mid-Atlantic Military Families, LLC ("Mid-Atlantic"); (4) LPC Property Management, Inc. ("LPCPM"); and (5) TWF Construction ("TWF"). As alleged by Plaintiffs, LPC is an international property acquisition and management company that manages 31,000 military homes nationwide. Compl. ¶ 3, ECF No. 1-1. LMH is an affiliated company that allegedly manages and operates more than 4,000 military housing units in the Tidewater area. Id. Under the Department of Defense's Military Housing Privatization Initiative ("MHPI"), LMH and its subsidiaries allegedly manage and operate the military housing under a fifty-year lease. Id. Mid-Atlantic is an affiliate or subsidiary of LMH and identified as the owner/landlord on Plaintiffs' lease. Id. ¶ 4. LPCPM is an authorized agent for Mid-Atlantic that manages the performance of all maintenance activities for the military housing occupied by Plaintiffs. Id. ¶ 5. Finally, TWF is a business operated by Troy Wayne Farrar II, an independent contractor who performed demolition and repairs in Plaintiffs' home. Case No. 2:13cv660, Compl. ¶ 3, ECF No. 1-1.

### B.   FACTS AS ALLEGED BY THE PARTIES

#### 1.   Initial Complaints

The Federicos signed the lease to the home in question on October 14, 2010. Dep. of Shelley Federico at 23:15–24:1 ("S. Federico Dep."). That same day, Mr. and Mrs. Federico did

a walk-through inspection of the home. Id at 26:8–15. None of Lincoln's[2] representatives were present. Id at 26:16–18. During the walk-through, the Federicos completed a form, on which they did not note any moisture or mold conditions. Id. at 26:20–28:5.

The family's first complaints involved the kitchen sink and the master bedroom toilet. Plaintiffs made their first complaint regarding water intrusion on October 15, 2010, just a day after they signed the lease. Id. at 33:8–9. Mrs. Federico called maintenance to report that the kitchen sink was leaking. Id. at 33:14–34:3. A Lincoln technician responded four days later to fix the sink, and Mrs. Federico reported that the problem was remedied and that there was no mold under the sink. Id. at 36:10–38:17; ECF No. 427-12 at 137 (LMH_0012123). On February 3, 2011, Mrs. Federico again complained about water leaking under the sink and requested that maintenance recaulk the sink. S. Federico Dep. at 68:6–71:8; ECF No. 427-12 at 139 (LMH_0012157). The following day, a service technician responded and recaulked the sink. S. Federico Dep. at 71:9–21; ECF No. 427-12 at 139 (LMH_0012157).

On October 18, 2010, Mrs. Federico called maintenance to report that the master bathroom toilet would not stop running and was loose. S. Federico Dep. at 51:1–11. She testified that the family had noticed a puddle around the base of the toilet and had consequently refrained from using the toilet. Id. at 53:1–54:6. The following day, a technician installed a valve seal in the toilet. ECF No. 427-12 at 138 (LMH_0012126). Mrs. Federico testified that after this initial repair to the toilet, the toilet continued to wiggle but there was no leakage. S. Federico Dep. at 56:4–18. Then on December 7, 2010, Mrs. Federico called to request that someone paint the baseboard in the master bathroom. Pls.' Ex. 16 (LMH_0002046), ECF No. 437-17. The service ticket reflects that Mrs. Federico said there were signs of water penetration and that the

---

[2] In conformity with the filings of the parties, "Lincoln" is used generally to describe the actions of the Defendants. The use of "Lincoln" is not meant to ascribe conduct to LMH or LPC specifically.

flooring was "bubbling up." Id. According to the ticket, a vendor came to the home three days later and replaced the vinyl. Id. A few months later, on April 28, 2011, Mrs. Federico again called the maintenance hotline to report that the toilet seal was broken and the toilet was starting to leak around the bottom. S. Federico Dep. at 78:2–19. It appears that this complaint was improperly typed on the service ticket, which stated that the toilet "seat" was broken. Pls.' Ex. 19 (LMH_002064), ECF No. 437-20. Despite what the ticket says, Mrs. Federico testified that the maintenance technician replaced the seal. S. Federico Dep. at 78:10–14, 80:20–22.

### 2.    The Master Bedroom and Master Bathroom

The crux of Plaintiffs' claims centers on the master bedroom. In May 2011, Mrs. Federico planted a flower bed in front of the window at issue. Id. at 98:9–99:13, 120:1–4. Mrs. Federico explained that there were dead shrubs that were scratching against the bedroom window. Id. at 85:1–5. She called the maintenance hotline to request that the shrubs be removed or trimmed. Id. at 85:6–10. Lincoln's lawn crew trimmed the shrubs, but Mrs. Federico stated that the branches still scratched the window. Id. at 86:6–10. As a result, Mrs. Federico decided to remove the shrubs herself and plant a flower bed. Id. 86:21–22. After removing the shrubs, Mrs. Federico leveled out the dirt, put down a water barrier, and added 10 bags of topsoil, the new plants, and 20 bags of mulch. Id. at 98:13–99:4, 106:12–1 5. She planted sweet potato plants, petunias, periwinkles, and shrubs. Id. at 102:2–18.

The family used an oscillating sprinkler to water the new flower bed. Id. at 123:15–22; Dep. of J.F. at 33:2–10 ("J.F. Dep."). Although Mrs. Federico testified that the sprinkler's spray never hit the bricks on the front of the home, S. Federico Dep. at 130:1–11, Mrs. Federico's daughter, J.F., who did some of the watering, testified that she had a problem keeping the sprinkler from spraying on the front of the house. J.F. Dep. at 35:8–22. J.F. stated that she was eventually able to set up the sprinkler so that the water would hit only the bottom row of bricks.

4

Id.

On June 17, 2011, just one month after planting her flower bed, Mrs. Federico made her first complaint about water intrusion into the master bedroom window. S. Federico Dep. at 156:12–21. According to the maintenance ticket, Mrs. Federico reported that the master bedroom window leaked and let in water when it rained or water was sprayed on it. ECF No. 427-12 at 142 (LMH_0012184). She testified that the carpet was "soaking wet," to the point where the "water would run up and over your foot." S. Federico Dep. at 161:1–3. Lincoln retained contractor Jason Dozier, who worked on the window four days later. Decl. of Jason Dozier ¶ 3, ECF No. 427-8 ("Dozier Decl."). Mr. Dozier affirmed that he observed the oscillating sprinkler spraying water on the window and that Mrs. Federico told him that the window would leak when she watered her flower bed. Id. ¶¶ 4–5. Mr. Dozier explained, "When I inspected the window, I did not see any signs of water penetration or signs of water damage on the interior of the home. Nonetheless, I installed weather stripping in the window and caulked the window to prevent leakage." Id. ¶ 6. Additionally, Mr. Dozier claimed that he told Mrs. Federico not to run the sprinkler on the window, but she told him that she planned to continue to do so. Id. ¶ 7. Finally, Mr. Dozier stated that he recommended to the Lincoln maintenance manager that parts of the window frame be rebuilt. Id. ¶ 8. He stated that he returned on July 8, 2011 to do so, and he did not feel that any additional work was necessary to prevent leakage. Id.

However, on July 11, Mrs. Federico reported that the window was leaking water again, that the carpet was "pulled away from the wall" and wet, and that the wall had some "discoloration." Pls.' Ex. 25 (LMH_0012194), ECF No. 437- 26 ("Pls.' Ex. 25"); S. Federico Dep. at 183:6–20, 193:3–10. The following day, Roy Yobp, Lincoln's maintenance manager, inspected the window but found no evidence of water intrusion or mold. Pls.' Ex. 25; Declaration

5

of Roy Yobp ¶ 5, ECF No. 427-10 ("Yobp Decl."). Nonetheless, Mr. Yobp hired a contractor, TWF, and one day later, TWF removed siding above the window to determine if there was a vapor barrier behind the siding. Yobp Decl. ¶ 5; Dep. of Troy Farrar at 67:22–68:22 ("Farrar Dep."). Mr. Farrar testified that there was a vapor barrier that was appropriate "for the time period that it was installed." Farrar Dep. at 68:24–69:2. Mr. Farrar installed a new vapor barrier, taped the window flashing with Tyvek, and caulked all the "J" channels. Pls.' Ex. 25.

On July 21, Mrs. Federico again called maintenance to report that the window was leaking and that there was "water all over the floor." S. Federico Dep. at 196:1–10. A maintenance technician responded the same day, and the next day a contractor determined that the window was rotten and needed to be replaced. Id. at 198:8–199:11. However, Bill Bisbee, the contractor, did not observe water damage or moisture on or around the window. Decl. of William Ferris Bisbee, IV ¶ 5, ECF No. 427-4 ("Bisbee Decl."). Mr. Bisbee ordered a new window immediately, but it did not arrive for weeks. Id. ¶ 6; S. Federico Dep. at 199:7–15. On September 8, 2011, Mr. Bisbee finally installed the new window and flashing, and sealed the window with caulk. Bisbee Decl. ¶ 6. After Mr. Bisbee replaced the window, Mr. Yobp tested it by spraying water full blast on the window for several minutes. Yobp Decl. ¶ 8. Mr. Yobp averred that no water leaked into the home as a result of this testing. Id.

On September 16, 2011, after a rainstorm, Mrs. Federico again reported a leak in the window. Pls.' Ex. 29 (LMH_0012205), ECF No. 437-30 ("Pls.' Ex. 29"). She described the carpet underneath the window as being so wet that "the water could come up and over your foot." S. Federico Dep. at 217:19–219:14. The maintenance ticket reflects that Mrs. Federico stated that there was water penetration behind the master bathroom door. Pls.' Ex. 29. On September 19, the following business day, Lincoln scheduled Mr. Bisbee to return to inspect the

window. Id. On September 20, Mr. Bisbee returned to the home and inspected the window but did not see any signs of leaks or water penetration. Bisbee Decl. ¶ 7. Nonetheless, Mr. Bisbee recaulked around the window. Id.

On September 21, 2011, Mrs. Federico called the maintenance hotline and reported an "orange mold" and a foul smell in her master bathroom. Tr. of Call Center Recording at 3:20–24, Sept. 21, 2011, Def. Ex. B, ECF No. 427-3. That same day, Lincoln managers Roy Yobp and Stephanie German, inspected the home and used a moisture meter under the window in the master bedroom. Yobp Decl. ¶ 11; Decl. of Stephanie German ¶ 6, ECF No. 427-6 ("German Decl."). According to Mr. Yobp and Ms. German, the moisture meter did not detect any moisture. Yobp Decl. ¶ 11; German Decl. ¶ 6. Mr. Yobp averred, "I also thoroughly inspected the area around the master bedroom window and found no evidence of water damage on the interior wall or floor board. I do not recall any unusual odors or smells in their home that would be associated with mildew or water damage." Yobp Decl. ¶ 11. Mr. Yobp admitted, however, that the carpet pad under the window was wet. Id. Similarly, Ms. German asserted that she saw no evidence of water damage or mold but noticed that the carpet was moist. German Decl. ¶ 7. Consequently, Mr. Yobp retained Peerless Carpet Care and Restoration Service, which removed the carpet pad by the window and applied antimicrobial that same day. Yobp Decl. ¶ 11; Pls.' Ex. 26 (LMH_0001820), ECF No. 437-27.

### 3.   The Foundation

Mr. Yobp and Ms. German also inspected the outside of the home and noticed that there was water pooling and "suspected that the foundation of the home might have a crack that was allowing the pooled water from the sprinkler to penetration the foundation." Yobp Decl. ¶ 12; German Decl. ¶ 9. As a result, they hired TWF to excavate the ground in front of the home to see if the foundation was cracked. Yobp Decl. ¶ 12.

In response, an employee of TWF, Bill Hayden, used a backhoe to dig a four-foot hole in front of the home. Id. ¶ 13; Farrar Dep. at 73:21–74:24. In the timeline provided to the Court at the April 2015 hearing on these motions, Defendants represented that the initial excavation was done on October 5 and that TWF returned to seal the foundation, fill the hole, and grade the area the following day. The timeline, however, does not acknowledge that the work in sealing the foundation, filling the hole, and grading the area was not done all in one day. Mrs. Federico testified that the hole was left open for a few days. S. Federico Dep. at 250:7–8. According to Mrs. Federico, Mr. Hayden told her that the ground was "really, really wet" and that he wanted to leave the hole open a few days to dry out before sealing the foundation. Id. at 249:10–15. At some point someone from TWF sealed the crack in the foundation, but the trench continued to stay open for days before it was refilled and graded. Id. at 264:16–20.

### 4.    The Master Bedroom Wall

On October 13, 2011, an employee of TWF, Scott Hayward, accompanied by Mr. Farrar, went to the home to remove drywall in the master bedroom and bathroom. Decl. of Scott Hayward, IV ¶¶ 2–3, ECF No. 427-7. According to Ms. German, Mrs. Federico had repeatedly insisted that the drywall under the window be cut open to investigate the leaks. German Decl. ¶¶ 11–12. Ms. German affirmed that she did not believe it was necessary to remove the drywall but ordered that it be done at the insistence of Mrs. Federico. Id. Using a sheetrock handsaw, Mr. Hayward removed the bottom 14 inches of the drywall and baseboards. Hayward Decl. ¶¶ 6–7.

It is undisputed that Mr. Hayward did not use containment procedures. At his deposition, Mr. Farrar testified that he did not think containment was necessary because there were "no visible signs of mold." Farrar Dep. at 96:3–12. Ms. German and Mr. Yobp also averred that they did not think containment procedures were necessary because they had not detected moisture in

the wall when they tested using the moisture meter and because none of the technicians who had been in the home had seen signs of water damage or mold. German Decl. ¶12; Yobp Decl. ¶ 15.

Plaintiffs and Defendants dispute both the home's condition and Mrs. Federico's condition on the day the wall was cut open. With respect to the home, Mr. Hayward affirmed that the back of the drywall and the insulation were damp but not saturated. Hayward Decl. ¶ 8. Mr. Hayward also averred that there was a little dust on the carpet, but the debris from sawing into the wall did not spread. Id. ¶ 7. Mr. Farrar testified that Mr. Hayward called him and said that he had removed the drywall and that the insulation was wet and there was some "suspect material on the back of the drywall that appeared to be mold." Farrar Dep. at 89:13–21. Mr. Farrar called Mr. Yobp to relay this information and then went to the home himself. Id. 89:24–90:7. Mr. Farrar recalled that the insulation was "dripping wet" and that once Mr. Yobp arrived, Mr. Farrar and Mr. Hayward left the home. Id. at 89:14–21.

Ms. German and Mr. Yobp came to the home after the wall was opened. Ms. German told Mrs. Federico that Lincoln would have her carpet replaced if she moved her furniture. S. Federico Dep. at 281:10–13. Consequently, Mr. Federico came home to help Mrs. Federico move the furniture. Id. at 281:13–16. Ms. German and Mr. Yobp both looked at the wall cavity when they visited the home. Ms. German affirmed that she inspected the cavity and saw no signs of "moisture, water damage or mold." German Decl. ¶ 16. Similarly, Mr. Yobp stated that he saw no signs of water damage or mold when he looked at the wall and the cavity. Yobp Decl. ¶ 16.

On the other hand, Mrs. Federico testified that when the wall was opened, it smelled "horrendous," that the inside of the cavity was very wet, that the wood inside the wall was black and that the screws were rotten and rusted. S. Federico Dep. at 301:3–302:3. Mrs. Federico admitted, however, that she did not know for certain whether what she saw in the wall cavity was

mold. Id. at 302:6-11. Mr. Federico also testified that when he came to the home to move furniture, it smelled like sewer. Dep. of Joe Federico at 113:1–6 ("J. Federico Dep.").

At some point that day, Mr. Hayward also cut out the flooring in the master bathroom. Hayward Decl. ¶ 9; S. Federico Dep. at 281:22. Although Mr. Hayward affirmed that he saw no "visible mold growth in the master bathroom area," Mrs. Federico said that she saw "rings" under the linoleum and that Mr. Hayward told her they would spray some "KILZ" on it and it would be "good as new." Hayward Decl. ¶ 9; S. Federico Dep. at 301:12–20. After Mr. Hayward cut the flooring, Lincoln scheduled Carpet World to come to the home on October 19, 2011 to replace the vinyl. Pls.' Ex. 21 (LMH_0012212), ECF No. 437-22. This work, however, was not completed because the family moved out of the home. See id.

The parties hotly contest Mrs. Federico's physical condition on October 13. Mrs. Federico testified that within a few hours of the opening of the wall, she got very dizzy and was "disoriented." S. Federico Dep. at 305:11–14. She also stated that she "projectile vomited" three or four times, her eyes swelled, she had trouble breathing, she was coughing, and she had a massive headache. Id. at 305:15–22. She explained that she began vomiting before her husband got home, and she continued to vomit while he was there helping move furniture and after he went back to work. Id. at 309:8–12. She testified that the vomiting was so severe that it was "coming out of [her] nose." Id. at 309:5–7. Finally, she stated that she went to the emergency room that night. Id. at 313:1. Plaintiffs have produced the records from the emergency room which show that Mrs. Federico was diagnosed with acute bronchitis on October 13. Pls.' Ex. 33, ECF No. 437-34.

The testimony of Mrs. Federico's family does little to prove or disprove her assertions. Mrs. Federico's daughter seems to have little memory of her mother's condition on October 13,

but she did testify that she thought Mrs. Federico had told her that she was not feeling well. J.F. Dep. at 52:4–15. In the excerpts of deposition testimony the Court has received, Mr. Federico said little about Mrs. Federico's health on October 13, except that she did not throw up while he was in the home. J. Federico Dep. at 117:4–8.

Although Mrs. Federico testified that Mr. Yobp knew she was sick, see S. Federico Dep. at 305:19–306:2, 309:21–310:4, he has averred that she "did not exhibit any signs of physical illness, such as vomiting" while he was in the home. Yobp Decl. ¶ 17. In fact, not one of Lincoln's employees or vendors in the home that day recalled Mrs. Federico displaying any signs of illness. Hayward Decl. ¶ 10; Farrar Dep. at 97:4–24; German Decl. ¶ 14. Ms. German, however, did affirm that she offered to move the family to a guest suite since Mrs. Federico reported that her nose was running and that she got a headache after the wall was opened. German Decl. ¶ 16.

That afternoon, Mrs. Federico called the Lincoln maintenance hotline to request copies of all of her maintenance tickets in preparation for a meeting the following day with the regional housing director. Audio Recording of October 13, 2011 Maintenance Call (LMH_0014177), Def. Ex. C, ECF No. 427-3. The Court has listened to the recording of this call. Mrs. Federico's demeanor on the six minute phone call does not reflect that she was disoriented, projectile vomiting, or suffering from severe headaches or difficulty breathing. She did, however, state that she had been "very, very, very ill" and that she was "still sick." Id.

### 5.    After Plaintiffs Moved Out of the Home

The Federico family moved out of the home that day. German Decl. ¶ 17. Ms. German informed Ryan Quillin, the Regional Manager, that she had moved the family to a guest suite. Decl. of Ryan Quillin ¶¶ 2, 4, ECF No. 427-9 ("Quillin Decl."). Mr. Quillin went to the vacant home that afternoon and saw no evidence of mold or water damage, but he directed technicians

11

to place dehumidifiers in the home. Id. ¶ 10.

On October 14, Mr. and Mrs. Federico met with Mr. Quillin and various Lincoln employees. Id. ¶ 11; S. Federico Dep. at 332:8–333:1. Mrs. Federico stated that she did not want to move back into the home. Quillin Decl. ¶ 11; S. Federico Dep. at 333:14. Mrs. Federico provided some medical records and stated that she had asthma and the home aggravated her health conditions. Quillin Decl. ¶ 11. Mr. Federico explained that he wanted to be relocated into a newer home built by Mid-Atlantic, not by the Navy. Id.

Mr. Quillin alleges that he saw Mrs. Federico on October 17 and that she threatened to get an attorney and insisted on hiring Coastal Home Inspections, LLC ("Coastal") to inspect her home. Id. ¶ 12. That same day, Mrs. Federico sent Mr. Quillin an email that purported to summarize a phone conversation she had with Mr. Quillin that day. Id. at Ex. B (TAB S 0060). The parties dispute whether this email accurately reflects what Mr. Quillin told Mrs. Federico. See id. at ¶ 13. Regardless, in her email, Mrs. Federico requested that the family be relocated to The Village at Whitehurst Farms. Id. at Ex. B (TAB S 0060). Mr. Quillin responded via email the following day. Id. at Ex. C (LMH_0012311). He offered her a home in Whitehurst Farms, even though the family was not eligible for a four-bedroom home. Id. Moreover, he stated that Lincoln would arrange and pay for "moving, cleaning, and/or laundering of furniture and fabric items" as well as temporary storage of those items. Id. However, Mr. Quillin also said that Lincoln would not pay for Coastal to inspect the home because Lincoln was "not familiar with the company" and an inspection was unnecessary because the family had moved out of the home and Lincoln had offered to clean their furniture and fabric items. Id.

The following day Mr. Quillin again emailed Mrs. Federico to see if her family had chosen a new home and requested that she respond by 5:00 PM on October 19. Id. at Ex. D

(TAB S 0003). On the 19th, Mrs. Federico responded and accepted the offer to live at the Whitehurst home. Id. at Ex. E (LMH_0004941). On Thursday, October 20, Mr. Quillin told Mrs. Federico by email that the home was reserved and requested that she call him on Monday to make arrangements for her property to be cleaned. Id. at Ex. G (LMH_0004943).

On October 24, 2011, Plaintiffs' attorney, David Bailey, sent a representation letter to Lincoln, explaining that all communication should go through his office and that he planned to file suit. ECF No. 427-12 at 150 (LMH_0012314). The letter also stated, "You are advised that the unit is a place of evidence and no change in the condition of the unit should occur, except for non-destructive inspections and assessments, without notice to this office and an equal opportunity to inspect." Id. at 151. Additionally, Mr. Bailey stated, "The landlord is hereby given notice that the personal property inside this unit will be left by the tenant until the landlord can arrange for cleaning, if possible, or replacement." Id.

Mrs. Federico retained private contractors to inspect and clean her property. On October 24, the same day Mr. Bailey sent his representation letter, Mrs. Federico met with Tony Ortiz, the owner of Puro Clean, at the home. S. Federico Dep. at 352:3–19. In a letter to Mr. and Mrs. Federico dated October 25, Mr. Ortiz reported that he had done a "visual check" and concluded, "After reading the report completed by Coastal Inspections and seeing the levels of Stachybotrys and Chaetomeum spores, I do not want to carry the liability of not properly remediating these types of spores and contaminating further areas outside of this home." Pls.' Ex. 34, ECF No. 437-35. When questioned about this statement at his deposition, Mr. Ortiz testified that he wanted to be clear that he could only clean some of Mrs. Federico's property, that if she wanted to keep some of her paper, wood, and fabric items, they would have to be cleaned by a separate company. See Dep. of Anthony Ortiz at 51:1–17, ECF No. 427-12 ("Ortiz

13

Dep."). Moreover, although he would clean some of the family's property, he wanted to disclaim liability. See id. at 129:15–18 (stating that he was "willing and able to participate and go forward in the project."). He testified, "I don't want to be sued if later on down the road after what I've told them, they find more mold—mold—mold growth coming up for items that I recommended be thrown away." Id. 51:22–52:3.

When he did not hear from Mrs. Federico after his October 20th email, on October 31, Mr. Quillin emailed her to see how she wanted to proceed with her household goods. Quillin Decl. at Ex. F (LMH_0008866). On the same day, Steve Davis, an LPC technician, went to the original Federico home to check the dehumidifiers. Id. at ¶ 22. When he arrived at the home, Mrs. Federico stopped him at the door and threatened to call the police if he tried to enter. Id. Mr. Davis reported that he saw a crowd of neighbors watching men in hazmat suits entering and exiting the home, as well as a news crew. Id. The men in hazmat suits were from Puro Clean and they were inventorying the family's property. S. Federico Dep. at 427:18–21.

On November 1, 2011, Mr. Quillin emailed Mrs. Federico to notify her that Lincoln planned to perform repairs in her old home on November 3rd, that the family could not occupy the home while the repairs were performed, and that Lincoln would ensure their property was covered and protected. Quillin Decl. at Ex. H (LMH_0004945). The email referenced the incident on October 31 and generally requested that the family cooperate by providing access to the home so that maintenance could be done. Id.

On November 7, 2011, the family turned in their keys and terminated their lease but left all of their belongings in the home. Id. ¶ 24. The family's belongings remained in the home until January 31, 2012. Decl. of Jim Brady ¶ 4, ECF No. 427-5 ("Brady Decl."). As mentioned above, the Federicos retained Mr. Ortiz to clean some of their property. Michael Pinto of Wonder

Makers Environmental and Paul Davis Restoration were also involved in the cleaning of the Federico property, through a pro bono project. See S. Federico Dep. at 487:4–21; ECF No. 427-12 at 212–13 (TAB S 0263). Mr. Pinto prepared the remediation protocol for Mr. Ortiz and Paul Davis Restoration to follow. S. Federico Dep. at 465:4–19. Mr. Pinto sent the final protocol to Mrs. Federico, Mr. Ortiz, and Mr. Bailey on December 23, 2011. Dep. of Michael Pinto at 131:9–17; ECF No. 427-22 at 15 (TAB O 0005). Mrs. Federico told Mr. Pinto that Mr. Bailey said that he would try to obtain access to the home for the testing and cleaning once the lawsuit was filed. ECF No. 427-12 at 212 (LMH_0003127). On January 30, 2012, after the instant suit was filed, at the request of the Federicos, a Lincoln contractor packed the Federicos' property and moved it from the prior home to a storage unit the following day. See Brady Decl. ¶ 4.

Mr. Bailey retained ECS Mid-Atlantic, LLC ("ECS") to inspect the property in the storage unit. ECF No. 427-12 at 214 (TAB E 0046). This inspection was performed on February 10, 2012. Id. The ECS report indicated that there was no visible mold on any of the items evaluated. Id. at 215. The report also stated that of the three tape samples taken, only the sample from the television stand indicated significant concentrations of mold. Id. However, ECS reported that it was unable to look at most of the items in the storage unit because they were in boxes and also that the belongings appeared to have been pre-cleaned since there was little or no dust on the items evaluated. Id. On March 15, 2012, Mr. Bailey's office sent the results of the ECS testing to Mr. Ortiz. ECF No. 427-21 at 15 (TAB L 0001).

On April 17, 2012, Mr. Ortiz tested and cleaned the property. ECF No. 427-22 at 23. Mr. Ortiz cleaned the non-porous items, and the porous items (such as clothing) were sent to Mr. Davis for cleaning. S. Federico Dep. at 485:2–18, 488:1–7. Mr. Ortiz sent the samples he collected to Mr. Pinto at Wonder Makers for analysis. ECF No. 427-22 at 23. The Wonder

Makers report reflects that two samples were taken of each item: one before it was cleaned and one after it was cleaned. Id. at 26. Mr. Pinto testified that the pre-cleaning tests indicated that there was "some mold and some pollen" on each item and that pollen or mold took up less than one percent of the area on the Bio-Tape sample. Pinto Dep. at 174:7–12. The report concluded, "The contents or surfaces represented by the post-cleaning samples have satisfied the post-cleaning criteria . . . indicating that the cleaning procedures were effective in returning the contents/surfaces to a normal-fungal ecology . . . ." ECF No. 427-22 at 24.

The parties dispute, and the Court cannot determine, whether the personal property was cleaned. On the one hand, the Wonder Makers report and Mrs. Federico's testimony indicate that at least some of the family's property was cleaned. On the other, Plaintiffs throughout this litigation have alleged that their property was not cleaned. For example, in their brief in opposition, Plaintiffs state, "Despite all their efforts, the Federicos were unable to get anyone to clean their property, including LMH, and that fact speaks louder than LMH claims." ECF No. 437-1 at 18. The parties also contest whether anyone from Lincoln put any of the family's belongings on the curb without the Federicos' knowledge. Id.; Pls.' Ex. 35, ECF No. 437-36.

### 6. The Navy's Involvement in Plaintiffs' Home

In support of their Motion for Judgment on Derivative Sovereign Immunity, Defendants have submitted a declaration by Jarl Bliss, an employee of LPC and LMH since 1987 who currently manages military housing operations in the Hampton Roads area. Decl. of Jarl Bliss ¶ 2, ECF No. 428-2 at 1 ("Bliss Decl."). Mr. Bliss stated that Mid-Atlantic was formed in 2005 as a public-private venture ("PPV") between the Navy and LFC. Id. ¶ 3. He explained that as part of the negotiations, LFC or an affiliate conducted environmental site assessments on 20 to 25 percent of the homes that would be covered by the Mid-Atlantic PPV Agreements. Id. Mold was one of the issues the parties identified during the surveying process. Id. Mr. Bliss states that

LFC and the Navy considered the options "for assessing and remediating existing conditions and for establishing procedures for mitigating the risk of future moisture and mold problems." Id. Through the sampling, LFC identified 80 units that needed to be remediated and then decided whether to demolish, renovate, or remediate the homes. Id. ¶ 4. LFC and the Navy then drafted the Standard Procedures for Operations and Maintenance of Fungi-Containing Materials ("O&M Plan" or "Plan"). Id. ¶ 5. As stated in the O&M Plan itself, the purpose of the Plan was to "describe investigation procedures and work practice requirements which will be implemented to reduce the possibility of exposure to potentially harmful forms of mold." ECF No. 428-3 at 12. The Plan also included specific information about the mold conditions identified in the sampling and how Mid-Atlantic would address future mold issues. See, e.g., id. at 24–33. For instance, the Plan described a protocol for identifying and remediating mold based on the size of the affected area. Id. at 30–33.

### C.   PROCEDURAL HISTORY

Defendants have filed a Motion for Judgment on Derivative Sovereign Immunity and a Motion for Summary Judgment. Each of these motions has been fully briefed by both sides. The Court held oral argument on these motions on April 14, 2015. The Court now addresses each motion in turn.

### II.   MOTION FOR DERIVATIVE SOVEREIGN IMMUNITY

The Court first addresses Defendants' Motion for Judgment on Derivative Sovereign Immunity, ECF No. 428. On September 25, 2013, this Court issued an opinion in which in rejected a similar claim by Defendants that they were entitled to derivative governmental immunity. ECF No. 184. The Court dismissed the 2013 motion "without prejudice to [Defendants] asserting a derivative governmental immunity claim again in later proceedings if a sufficient basis therefore can be shown." Id. at 12.

17

A.   **STANDARD OF REVIEW**

As a general rule, the United States Government enjoys sovereign immunity from suit unless it has waived that immunity. The Federal Tort Claims Act ("FTCA") waived that immunity with respect to certain tort suits, but with various exceptions. The exception most relevant to the instant case is that immunity is not waived when the tort is based on the performance of a "discretionary function or duty." 28 U.S.C. § 2680(a) (stating that FTCA's waiver of immunity does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"). The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984) ("Varig Airlines").

The Supreme Court laid out a two-part test in Berkovitz v. United States to determine when a function is discretionary. 486 U.S. 531 (1998). First, discretionary conduct must involve "an element of judgment or choice" on behalf of the person or agency performing it. Id. at 536. Second, where there is some element of judgment or choice exercised, the exception protects only "governmental actions and decisions based on considerations of public policy." Id. at 537. The Supreme Court has explained that the public policy inquiry focuses "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 325 (1991).

Derivative governmental immunity also applies to government contractors who perform a discretionary function within the scope of a valid government contract. Butters v. Vance Int'l,

Inc., 225 F.3d 462, 466 (4th Cir. 2000) (noting that it is "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity"); Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1448 (4th Cir. 1996) (holding that derivative governmental immunity applies "to the extent that this case involves a discretionary governmental function which has been delegated to the private sector"). Contractors are protected to the same extent as the Government when they exercise appropriately delegated discretionary power. Mangold, 77 F.3d at 1447–48. ("If absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions."). Thus, in the instant motion, the question is whether Defendants' alleged actions are protected by the FTCA's discretionary function exception via derivative governmental immunity.

The second prong of the Berkovitz test creates cases in which a government agent performs a discretionary act within the scope of his employment but is not protected by the discretionary function exception. The example offered by the Supreme Court was that of a negligent government-employee driver who drives an automobile in the scope of his employment. See id. at 325 n. 7. In such a case, the public policy prong of the Berkovitz test was not met. The Court reasoned, "Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." Id.

Where the discretionary function exception applies, the court lacks subject matter jurisdiction. Williams v. United States, 50 F.3d 299, 304–05 (4th Cir. 1995). When subject

matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of proof. See Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). In considering a challenge to its subject matter jurisdiction, a district court may look beyond the pleadings without converting the proceeding to a motion for summary judgment. Id. Nonetheless, "[t]he district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Id. Consequently, "[t]he moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id.

**B.   ANALYSIS**

To prevail, Defendants must establish both prongs of the Berkovitz test: (1) the conduct involved an element of judgment or choice, and (2) the decisions were based on considerations of public policy. 486 U.S. 531 at 536–37. In 2013, this Court found that that the first prong was clearly met. ECF No. 184 at 10. Defendants' conduct involved an element of judgment or choice because Lincoln employees were not given clear directions on how to protect against and remediate mold problems. Id. Nonetheless, the Court rejected Defendants' claim because they had not shown that their decisions were based on public policy. Id. at 11.

In 2013, and again in the instant motion, Defendants relied heavily on Angle v. United States, 931 F. Supp. 1386 (W.D. Mich. 1994). In Angle, the plaintiff brought a negligence action against the United States, alleging that he suffered lead poisoning caused by lead-based paint in military housing. Id. at 1389. To address the issue of lead paint in military homes, rather than sample all housing units for an estimated cost of $51 million or remove all lead paint for an estimated cost of $900 million, the Air Force prohibited the future use of lead-based paint. Id. at 1390. The court considered "whether the government's action or inaction with respect to

20

existing lead-based paint in housing units was based on social, economic, or political policy." Id.

at 1396. The Angle court found that the Government had met the discretionary function test and

reasoned as follows:

> A problem had been identified and the defendant was considering how best to
> deal with that problem. The resolution of the problem had economic policy
> ramifications. Furthermore, the problem had political ramifications in that it
> affected the military housing program and thus, the objective of the military.

Id. at 1397. In 2013, this Court distinguished Angle and explained:

> The plaintiffs claim that these alleged violations of law and contract stem not
> from a designated policy but from individuals failing to perform their jobs with
> proper care. . . . While the plaintiffs in Angle alleged that their harms were the
> product of a negligent decision affecting thousands of units, the plaintiffs in this
> case allege that their injuries stem from a failure to provide safe housing free of
> significant mold buildup, unpleasant odors, and extensive water damage in a
> specific housing unit that had been brought to defendants' attention, as well as
> from negligent or nonexistent repairs. None of the concerns in Angle about large-
> scale budget issues or how to keep thousands of families safe from a potential but
> uncertain danger are present in this case. Rather, it is simply a question of whether
> defendants were negligent in repairing a particular housing unit when the dangers
> it posed became known. **If Lincoln Defendants had chosen to combat mold**
> **infestations with a plan for providing safe housing within the logistical**
> **constraints of their situation and plaintiffs alleged that the general plan was**
> **insufficient to protect them from harm, then Lincoln Defendants would be in**
> **an analogous position to the Angle defendants.** Here, however, the defendants
> are not alleged to have negligently weighed competing values incorrectly, but to
> have failed to react to an immediate and manifest danger.

Id. at 11–12 (emphasis added).

In the instant motion, Defendants argue that they now meet the public policy prong of the

Berkovitz test, again analogizing this case to Angle. Defendants argue that the Lincoln

Defendants and the Navy developed a plan "to evaluate, remediate, monitor, and combat

moisture and mold conditions in the military housing covered by the contracts. Because that plan

inherently required the consideration of public policy factors, such as financial and budgetary

constraints and military morale and readiness, derivative sovereign immunity bars Plaintiffs'

claims." ECF No. 428-1 at 1. As explained by Jarl Bliss, this plan involved a sampling of the homes and the adoption of an O&M Plan to address existing and future mold issues. ECF No. 428-2 at 2. Defendants argue that LFC and the Navy could have chosen a variety of courses to address mold issues: (1) inspect all of the homes for mold, (2) implement an O&M Plan on a going-forward basis only, or (3) demolish or remediate a larger group of homes. ECF No. 428-1 at 8. Instead, "based on an assessment of financial, budgetary, and operational considerations," Defendants and the Navy "conducted a survey of the portion of the homes, demolished or remediated a group of those homes, and adopted a plan to mitigate and remediate water intrusion and mold conditions on a going forward basis." Id. at 8. Defendants contend that the decisions made in the O&M Plan were based on "considerations about military morale, readiness and retention, the long-term needs of the Navy and its military members, and budgetary and financial constraints." Id.

Defendants emphasize the Fourth Circuit's liberal interpretation of the public policy prong in Baum and Hawes. See Baum v. United States, 986 F.2d 716 (4th Cir. 1993); Hawes v. United States, 409 F.3d 213 (4th Cir. 2005). In Baum, the Fourth Circuit explained:

> Rather than requiring a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function, we are of [the] opinion that a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy. . . . [W]e find largely irrelevant the presence or absence of evidence that involved government agents which did or did not engage in a deliberative process before exercising their judgment.

Baum, 986 F.2d at 720–21. Using this framework, in Baum, the Fourth Circuit held that the choice of materials used in constructing parkway guardrails and the decision regarding replacement of guardrails were bound up in policy considerations and thus protected by the discretionary function exception. Id. at 722–24. The court explained, "The decision of how and

22

when to replace a major element of a substantial public facility is, like the decision involving design and construction, at bottom a question of how to allocate resources. Such a decision is inherently bound up in considerations of economic and political policy . . . ." Id. at 724. The Fourth Circuit cautioned, however, "we do not suggest that every maintenance decision of every government actor is so policy-based as to fall within the discretionary function exception . . . ." Id.

In Hawes, the Fourth Circuit found that the discretionary function exception applied to a Marine Corps officer's decision to suspend the repair of an obstacle course. 409 F.3d at 213. In determining whether the public policy prong of Berkovitz was satisfied, the court emphasized that "the policy analysis looks not toward the actual considerations of a government agent in undertaking the conduct in question, but instead to whether the actions '*are susceptible to policy analysis.*'" Id. at 217 (citing Gaubert, 499 U.S. at 324). The court stated that the Fourth Circuit had interpreted the phrase "public policy" broadly. Id. at 219. Considering the Fourth Circuit's liberal interpretation of the public policy prong, the Hawes court ultimately concluded, "Because the repair of military equipment on a military base involves the allocation and management of scarce military resources, we find that the underlying decisions implicate economic policy." Id. at 220.

The Hawes Court cited Bowman v. United States, 820 F.2d 1393, 1395 (4th Cir. 1987). In Bowman, the Fourth Circuit held that the National Park Service's failure to erect a guardrail was a policy decision. Id. There, the Fourth Circuit stated:

> Whether that decision grew out of a lack of financial resources, a desire to preserve the beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of the three is not known. What is obvious is that the decision was the result of a policy judgment.

Id.

23

Considering the Fourth Circuit's broad interpretation of the public policy prong, Defendants have most likely established that allegations regarding actions taken in accordance with the O&M Plan are protected by the discretionary function exception. However, Plaintiffs argue not that the Plan itself was defective, but that Defendants did not comply with their own plan. Although the formation of the Plan itself may have required the consideration of public policy factors, such as budgetary constraints and military morale, derivative sovereign immunity cannot bar claims that Defendants did not act in compliance with the Plan. As this Court explained in 2013, "the plaintiffs in <u>Angle</u> alleged that their harms were the product of a negligent decision affecting thousands of units" yet the Federico Plaintiffs "claim that these alleged violations of law and contract stem not from a designated policy but from individuals failing to perform their jobs with proper care." ECF No. 184 at 11. Despite the existence of a plan based on public policy considerations, Plaintiffs' allegations that Defendants did not follow their own plan prevent Defendants from meeting the <u>Berkovitz</u> test. Consequently, the Court **DENIES** Defendants' Motion for Judgment on Derivative Sovereign Immunity, ECF No. 428. Nonetheless, sovereign immunity adds a gloss on each claim, potentially immunizing conduct in line with the plan. However, sovereign immunity does not bar the suit as a whole.

### III.    MOTION FOR SUMMARY JUDGMENT

#### A.    STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. A defendant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In consideration of a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. <u>EEOC v. Navy Fed. Credit Union</u>, 424 F.3d 397, 405 (4th Cir. 2005). Summary judgment will, however,

be granted unless "a reasonable jury could return a verdict for the nonmoving party" on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Id. (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)). Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Roche v. Lincoln Property Co., No. Civ.A. 02-1390-A, 2003 WL 22002716 (E.D. Va. July 25, 2003).

A federal court hearing a state law claim must apply state law in accordance with the forum state's choice of law rules. See In re Merritt Dredging Co., Inc., 839 F.2d 203, 205 (4th Cir. 1988) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941)). Consequently, the Court applies Virginia law to Plaintiffs' claims.

**B.     ANALYSIS**

In support of their Motion for Summary Judgment, Defendants make the following arguments: (1) Plaintiffs cannot prove their negligence claims; (2) Plaintiffs cannot prove their negligence *per se* claims; (3) Plaintiffs cannot establish their violation of the VRLTA claim; (4) Plaintiffs cannot prove their breach of lease claim; and (5) Lincoln Military Housing ("LMH") and Lincoln Property Company ("LPC") should be dismissed.

**1.     Common Law Negligence Claims**

In these consolidated cases, Plaintiffs bring the following claims of common law negligence: (1) Count III of 2:12cv80 ("Federico I"); (2) Count I of 2:12cv596 ("Federico II"); (3) 2:12cv660 ("Federico III"); (4) 2:13cv661 ("Federico IV"); and (5) Counts I and II of 2:14cv178 ("Federico V"). In their various complaints, Plaintiffs contend that Defendants: (1) failed to disclose known and concealed defects concerning water intrusion and mold,

(2) failed to maintain the portions of the home outside the exclusive possession and control of the tenant, and (3) negligently performed repairs.

To establish negligence under Virginia law, a plaintiff must prove the following elements: (1) duty, (2) breach of that duty by not meeting the standard of care, (3) proximate cause, and (4) damages.[3] McGuire v. Hodges, 639 S.E.2d 284 (Va. 2007).

      a.      Duty

Under Virginia law, when a tenant takes possession, the landlord has a duty to put the tenant on notice of any *known* and concealed dangerous conditions. See Caudill v. Gibson Fuel Co., 38 S.E.2d 465, 469 (Va. 1946) ("Where the right of possession and enjoyment of the leased premises passes to the lessee . . . in the absence of concealment or fraud by the landlord as to some defect in the premises, known to him and unknown to the tenant, the tenant takes the premises in whatever condition they may be in . . . ."). Plaintiffs have failed to offer any evidence that Defendants had prior knowledge that there were water intrusion and mold issues in the home that created dangerous conditions. In fact, Plaintiffs have set forth no argument regarding this theory of negligence. Consequently, Plaintiffs' claim based on known and concealed defects is dismissed.

Plaintiffs' remaining theories of common law negligence center on allegations of failure to maintain portions of the home outside of their exclusive control and negligent repair. "[I]t is well-settled in Virginia that, under the common law, a landlord has no duty to maintain in a safe condition any part of the leased premises that [is] under a [tenant's] exclusive control." Isbell v. Commercial Inv. Assocs., Inc., 644 S.E.2d 72, 74 (Va. 2007) (internal citation and quotation

---

[3] By Court order, the parties have not yet presented arguments as to damages. See e.g. ECF No. 87 (noting that "all discovery will be limited to liability and shall not involve damages or injuries until further Order of the Court.")

marks omitted). Conversely, "[a] landlord owes the duty to his tenant to exercise ordinary care and diligence to maintain in a reasonably safe condition areas over which he has control." <u>Gulf Reston, Inc. v. Rogers</u>, 207 S.E.2d 841, 844 (1974). Although "a landlord is not liable in tort for a tenant's personal injuries caused by the landlord's failure to repair premises under the tenant's exclusive control and possession," a landlord who undertakes repairs and does so negligently may be liable. <u>Holland v. Shively</u>, 415 S.E.2d 222 (Va. 1992).

Plaintiffs have not set forth any evidence or even argument that any of the disputed areas were outside of their exclusive control. However, because both theories of negligence (failure to repair areas outside of the tenant's exclusive control and negligent repair) ultimately rely on a standard of "ordinary care," and the Court finds that Plaintiffs have not proven the element of breach, the Court need not determine what areas, if any, were outside of the Federicos' exclusive control.

      b.     Breach

Plaintiffs have not met their summary judgment burden on their common law negligence claims because they have not proven the breach element by establishing the applicable standard of care and a deviation from that standard of care.

Under Virginia law, negligence involves "the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." <u>Cowan v. Hospice Support Care, Inc.</u>, 603 S.E.2d 916, 918 (Va. 2004). Plaintiffs must present evidence to define this general standard so that a jury can apply it. In this case, expert testimony may be required to establish the standard of care. Defendants contend that expert testimony is required and that Plaintiffs have not presented admissible expert testimony establishing that standard. ECF No. 427-1 at 20–21. The Court has repeatedly explained that it declines to address the admissibility of Plaintiffs experts at this time. For the purposes of this

discussion, the Court will assume, without deciding, that Plaintiffs' experts are admissible. Nonetheless, Plaintiffs have not adequately established the standard of care.

In their brief in opposition to the Motion for Summary Judgment, Plaintiffs argue that no expert testimony is necessary to establish the standard of care because Plaintiffs can rely on the Virginia Residential Landlord and Tenant Act ("VRLTA") and the Virginia Uniform Statewide Building Code ("VBC") to inform the standard of care. The VRLTA and the VBC can inform the standard of care, but Plaintiffs must show more than simply a violation of these statutes to establish common law negligence. As this Court previously determined at the motion to dismiss stage, negligence *per se* claims are not cognizable under the VRTLA. See ECF No. 184 at 16. Nonetheless, "[t]he VRLTA is valuable for the purposes of defining the standards of care respectively imposed upon the parties even under a common law negligence action." Cromer v. Johnson Vill., LLC, No. CL04-37, 2005 WL 2108706, at *3 (Va. Cir. 2005). The Court finds that the VBC can also be useful in determining the appropriate standard of care but that simply proving violations of a statute may be insufficient to establish common law negligence.

To meet their burden on the breach element for common law negligence by relying on the VRLTA and the VBC to inform the standard of care, Plaintiffs must set forth which provisions apply, how they were violated, and what actions Defendants should have taken. In Morrison-Knudsen Co., Inc. v. Wingate, 492 S.E.2d 122 (Va. 1997), the Supreme Court of Virginia held that the plaintiff failed to establish the breach element of his common law negligence claim. The court reasoned:

> [T]he burden was not upon the defendants to show that they complied with industry standards or building codes, if any were applicable. Rather, the burden was upon the plaintiff to show that the defendants deviated from the standard of ordinary care, either by failing to observe applicable trade customs and building code provisions or by some other defalcation.

28

Id. at 124.

In their briefing in the instant case, Plaintiffs did not set forth a single specific provision of the VRLTA or the VBC, let alone show how it was violated. At the hearing, the Court repeatedly asked counsel to identify the standard of care. By the Court's count, the undersigned asked Plaintiffs' counsel, Mr. Bailey, on at least eight occasions what the standard of care was or what actions Defendants should have taken. See, e.g. Tr. of Hearing April 14, 2015 at 60:3–12, ECF No. 464 ("Hearing Tr.") ("It's so vague that I can't put my finger on it, and that's why I'm asking you to put your finger on it. Not only do I want to know what statutes are violated, I want to know what the standard of care is . . . . I don't know what the standard of care is that any expert has testified to."), 61:16–24 ("I was trying to find out—in all of these what I was trying to read was what is the standard of care. And so, you're constantly telling me the standard of care doesn't exist; it's a statute that exists . . . And whatever the statute says has to be performed, regardless of what happens."), 68:13–14 ("So what standard of care, so I'll know, was testified to by the experts, and which expert?"); 68:19–20 ("I'm asking you did they testify to any standard of care, and if so, tell me what they said."), 69:6–9 ("What I'm trying to say is we're not dealing with a standard of care here. Okay. What do you contend the defendants did or did not do in this case, specifically?"), 81:16–18 ("[C]onsequently, it's important to show each individual complaint about water damage and what the defendants did about it."), 82:4–5 ("I want to make sure that we get to that and what [Defendants] didn't do that they should have done."), 82:22–25 ("So the question then becomes what caused mold, where was it, and what was the remedy that should have been provided that would have prevented this from occurring."). The Court made it abundantly clear that it wanted to know what actions Plaintiffs alleged Defendants should have taken. The Court further indicated that it was not satisfied with Plaintiffs' counsel's responses.

29

For example, the Court stated, "Well, you and I have a problem Mr. [Bailey]—and the problem is we're dealing with facts, and you keep broadly saying, 'We have got mold, and therefore, the defendant is liable.'" Id. at 83:19–22.

Moreover, Plaintiffs' proposed experts are unable to satisfy the burden on the breach element. Dr. Vance proposes to testify about the applicability of the VBC to mold and moisture conditions in the Federico home. ECF No. 431-8 at 2–5. In his report, Dr. Vance does identify specific provisions of the VBC that he contends were violated. For instance, Dr. Vance explains that 304.2 of the VBC addresses windows and requires that windows be "maintained in good condition," and be "weather resistant and water tight." Id. at 3. Proving that there was a leak in the window, and thus a possible violation of the statute, however, does not show that Defendants' response was not *reasonable*. "The mere fact that a defect remained after the work was done is not alone sufficient." Kesler v. Allen, 353 S.E.2d 777, 779–80 (Va. 1987). With respect to the windows provision, for example, Dr. Vance does not address how Defendants should have responded to each water-related complaint. Instead, he generally concludes that Defendants "did not maintain window frames in a manner that keep the windows water tight" because "water routinely infiltrated the windows." ECF No. 431-8 at 3. Even Dr. Vance himself, in his deposition testimony, admitted that his opinions "don't squarely address the question of what the standard of care is." Dep. of Robert L. Vance at 34:3–6. Moreover, when the Court asked Mr. Bailey at the hearing if Plaintiffs' experts testified to any standard of care, Mr. Bailey responded, "No. They testified that the violation of the statute was the breach." Hearing Tr. at 68:19–22.

Plaintiffs' other expert, Mr. Chapman, is proposed as, among other things, an expert in the application of the Virginia Professional Standards for Mold Remediation as codified under

the VRLTA. ECF No. 431-1 at 1. Although Mr. Chapman makes various recommendations in his report, he offers no opinion on the work performed by Defendants. ECF No. 431-3 at 7–8. Moreover, at his deposition, when defense counsel asked Mr. Chapman if he was providing any opinion on whether the work done on the window was appropriate or met the standard of care, Mr. Chapman conceded, "Not with respect to the actual repair." Dep. of Christopher John Chapman at 321:3–8, ECF No. 431-4.

Consequently, since neither of Plaintiffs' experts has defined the standard of care and Plaintiffs' counsel is similarly unable to articulate specifically what the standard of care was and how Defendants failed to meet it, Plaintiffs have not met their burden on the breach element of their common law negligence claim. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' common law negligence claims is **GRANTED** and Plaintiffs' claims for common law negligence are **DISMISSED**.

### 2.      Negligence *Per Se* Claims

Next, Plaintiffs bring the following claims of negligence *per se*: (1) Count V of Federico I; (2) Count III of Federico II; (3) Count III of Federico V. These claims are based on alleged violations of the Virginia Maintenance Code ("VMC"), which is part of the VBC. This Court has already determined that negligence *per se* claims are cognizable under the VMC. See ECF No. 184 at 16–18.

A plaintiff alleging a negligence *per se* claim must establish the following: (1) the statute was enacted for public safety, (2) "he belongs to the class of persons for whose benefit the statute was enacted and the harm suffered was of the type against which the statute was designed to protect," and (3) the violation of the statute was the proximate cause of the injury. McGuire v. Hodges, 639 S.E.2d 284, 288 (Va. 2007). "While violation of such a statute provides the elements of a duty and breach, a plaintiff has not proved actionable negligence unless the

31

plaintiff also proves that the failure to adhere to the statutory requirement was a proximate cause of the injury." Id. Proximate cause is "generally a factual issue to be decided by the trier of fact." Schlimmer v. Poverty Hunt Club, 597 S.E.2d 43 (Va. 2004).

The Court finds that Plaintiffs have met their summary judgment burden to show genuine issues of material fact with respect to their negligence *per se* claims. First, the Court has already held that the VMC was enacted for public safety. See ECF No. 184 at 16–18. Moreover, section 102.1 of the VMC provides, "[T]he purpose of this code is to protect the health, safety and welfare of the residents of the Commonwealth of Virginia, provided that buildings and structures should be permitted to be maintained at the least possible cost consistent with recognized standards of health, safety, energy conservation and water conservation . . . ." Virginia Uniform Statewide Building Code, Part III, Virginia Maintenance Code § 102.1. Second, the Federicos are part of the intended protected class, as residents of the Commonwealth of Virginia. Moreover, the alleged harm is type of the harm intended to be protected against, as the Federicos' complaints are centered on negligent maintenance.[4]

To meet the third and final element, Plaintiffs must show that the violation of the VMC was the proximate cause of their injuries. At this time, there is a genuine issue of material fact with respect to causation that precludes summary judgment. Dr. Vance, if permitted to testify, would testify about alleged violations of the maintenance code. Dr. Vance's expert report creates a dispute of material fact as to whether the code was violated. Most importantly, because the Court initially restricted discovery to liability in this case and only recently ordered the parties to conduct discovery with respect to damages, the Court does not yet have all of the relevant evidence before it. Plaintiffs have requested personal injury damages as part of this negligence

---

[4] As explained supra at Part II.B, any claims of negligence that involved actions that were taken in accordance with the O&M Plan are barred by derivative sovereign immunity. Consequently, Plaintiffs' negligence *per se* claims are only cognizable to the extent that they allege that Defendants did not follow their own plan.

*per se* claim. Consequently, the Court cannot make a determination about causation without having reviewed any of Plaintiffs' medical records.

There remain genuine issues of material fact with respect to the Federicos' negligence *per se* claims based on the VMC. Consequently, Defendants' Motion for Summary Judgment with respect to the negligence *per se* claims is **DENIED** and these claims are not dismissed.

### 3.   Violation of the VRLTA

In Count I of <u>Federico I</u>, Plaintiffs bring a claim for property damages, expenses, and attorney's fees, based on violation of the VRLTA. In the 2013 Order on Defendants' Motion to Dismiss, the Court held that Plaintiffs could not recover damages for personal injury under the VRLTA but could recover the following damages: (1) property damage, pursuant to Va. Code §§ 55-248.13, -248.21, -248.40; (2) reimbursement of any temporary lodging expenses and mold remediation costs, pursuant to Va. Code §§ 8.01-226.12 and 55-248.18:2; and (3) reasonable attorneys' fees, pursuant to Va. Code § 55.248.21.

The VRLTA was enacted to provide a "comprehensive scheme of landlords' and tenants' contractual rights and remedies. <u>Isbell</u>, 644 S.E.2d at 78. The substantive provision most relevant to this case is Va. Code §§ 55-248.13. Subsection A of 55-248.13 sets forth the landlord's duty to maintain fit premises and, in relevant parts, requires a landlord to:

> (1) Comply with the requirements of applicable building and housing codes materially affecting health and safety;
> (2) Make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition;
> (3) . . .
> (4) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, hearing, ventilating, air-conditioning and other facilities and appliances . . . supplied or required to be supplied by him;
> (5) Maintain the premises in such a condition as to prevent the accumulation of moisture and the growth of mold, and to promptly respond to any notices from a tenant . . . .

Va. Code § 55-248.13(A). Subsection B explains, "The landlord shall perform the duties

imposed by subsection A in accordance with the law; however, the landlord shall only be liable for the tenant's actual damages proximately caused by the landlord's failure to exercise ordinary care." Va. Code § 55-248.13(B). The VRLTA was amended in 2008 to incorporate Va. Code § 8.01-226.12, which specifies the duties of a landlord with respect to visible mold. The most relevant portion of the amendment provides, "If visible evidence of mold occurs within the dwelling unit, the landlord or managing agent with the maintenance responsibilities shall, exercising ordinary care, perform mold remediation in accordance with professional standards." Va Code § 8.01-226.12(E). "Visible evidence of mold" is defined as "the existence of mold in the residential dwelling unit that is visible to the naked eye . . . ." Va. Code § 8.01-226.12(A).

"A landlord entering into a lease agreement subject to the VRLTA assumes the legal duties required in the Act as if they were incorporated into the lease agreement, and a violation of the statute gives rise to a breach of contract action." Sanders v. UDR, Inc., No. 3:10-CV-459, 2010 WL 3927804, at *4 (E.D. Va. Oct. 4, 2010). To recover on a breach of contract claim under Virginia law, a plaintiff must establish the following: (1) a legally enforceable obligation under a contract (here, the VRLTA); (2) a breach of that obligation; and (3) injury or damage caused by that breach. Id.

As with Plaintiffs' negligence claim, Plaintiffs cannot prove the breach element of their VRLTA breach of contract claim. As noted above, the VRLTA and the relevant amendment dictate that "ordinary care" is the standard. Consequently, Plaintiffs cannot simply show that the statute was violated, but must show that Defendants' actions constituted a failure to exercise ordinary care. As a result, the breach element of the VRLTA claim can be analyzed just as Plaintiffs' common law negligence claims. With respect to their common law negligence claims, the Court found that Plaintiffs had not met their burden of proving breach because they did not

specify what constituted the standard of care and what Defendants should have done to remedy the problems. See supra, Part III.B.1.b. Similarly, Plaintiffs' VRLTA claim must be dismissed because Plaintiffs have not shown breach of the VRLTA—that Plaintiffs' alleged injuries were proximately caused by Defendants' failure to exercise ordinary care. Defendants' Motion for Summary Judgment with respect to Count I of Federico I is therefore **GRANTED** and Plaintiffs' claim for violation of the VRLTA is **DISMISSED**.

### 4. Breach of Lease

In Count II of Federico I, Plaintiffs bring a claim for economic damages based on breach of their lease agreement. The Federico lease includes a choice of law provision that specifies that the "contractual relationship between the parties shall be exclusively governed by" the VRLTA and Virginia administrative and case law interpreting the VRLTA. ECF No. 427-12 at 114 (TAB A 0007). Plaintiffs' breach of lease claim relies entirely on violation of the VRLTA. Plaintiffs have presented no evidence that any independent terms of the lease itself were violated. Consequently, Plaintiffs' breach of lease claim collapses into their violation of the VRLTA claim. Since this Court has dismissed the violation of the VRLTA claim, the Court will similarly dismiss Plaintiffs' breach of lease claim. Therefore, Defendants' Motion for Summary Judgment with respect to Plaintiffs' breach of lease claim is **GRANTED** and the breach of lease claim, Count II of Federico I, is hereby **DISMISSED**.

### 5. LMH and LPC

Finally, Defendants argue that LMH and LPC should be dismissed from the consolidated cases because they are not proper parties. According to Plaintiffs, LMH's and LPC's liability is derived from their control over the companies directly involved in the management of Plaintiffs' home—Mid-Atlantic, an LLC; and LPCPM, a corporation.

A corporation is a "legal entity separate and distinct from the stockholders or

members who compose it." Dana v. 313 Freemason, 587 S.E.2d 548, 553 (2003). Therefore, when a corporation causes injury, it is the corporation, not the stockholders or members, that is liable for the injury. Id. Likewise, members of limited liability companies are not liable for "any personal obligation for any liabilities of a limited liability company, whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company." Va. Code Ann. § 13.1-1019.

Though a court may in some circumstances disregard the corporate entity and place liability directly on the members, to do so is an "extraordinary act to be taken only when necessary to promote justice." Dana, 587 S.E.2d at 553. There is no single determinative factor for when to place liability on an individual member or shareholder. Id. Rather, "[e]ach case must be considered in the context of its own specific circumstances." Id. In general, however, Virginia courts have required three elements to be present.

First, a plaintiff must show that "undue domination and control was exercised by the parent corporation over the subsidiary." Beale v. Kappa Alpha Order, 64 S.E.2d 789, 797 (1951). "Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." O'Hazza v. Executive Credit Corp., 431 S.E.2d 318, 320–21 (Va. 1993). "The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure." Richfood, Inc. v. Jennings, 499 S.E.2d 272, 276 (Va. 1998).

Second, a plaintiff must show that this control was used "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." O'Hazza, 431 S.E.2d at 320–21 (1993). Third, a plaintiff must show that "unjust loss or injury will be

36

suffered by the complainant as the result of such dominance unless the parent corporation is held liable." Beale, 64 S.E.2d at 797. The plaintiff has the burden to provide facts sufficient to demonstrate that a corporation or LLC is merely an alter ego of a parent organization. See Eure v. Norfolk Shipbuilding & Drydock Corp., 561 S.E.2d 663, 669 (Va. 2002).

Plaintiff argues that LPC and LMH are properly named defendants because the various entities directly involved "are all fruit from the same organizational tree and all control stems from Lincoln Property Company through Lincoln Military Housing." ECF No. 437-1 at 28. This argument, however, is inapposite to the rule of law in Virginia—that the parent of a corporation or LLC can only be held liable for the actions of its subsidiary in extraordinary circumstances. See Dana, 587 S.E.2d at 553. Such extraordinary circumstances are not present here. Plaintiffs do not make any showing that Lincoln Property Company or Lincoln Military Housing used their organizational structure to perpetrate a fraud or gain an unfair advantage. Nor do Plaintiffs identify any way in which adhering to the separateness of the companies would work an injustice.

Therefore, Defendants Lincoln Property Company and Lincoln Military Housing are **DISMISSED**.

## IV. CONCLUSION

For the reasons set forth above, the Court **ORDERS** the following:

(1) Defendants Motion for Judgment on Derivative Sovereign Immunity, ECF No. 428, is **DENIED**.

(2) Defendants' Motion for Summary Judgment, ECF No. 427, is **GRANTED IN PART** with respect to the following claims; therefore, the following counts/cases are **DISMISSED**:

(a) Count III of Federico I (2:12cv80) (common law negligence)

(b) Count I of <u>Federico II</u> (2:12cv596) (common law negligence)

(c) <u>Federico III</u> (2:12cv660) (common law negligence)

(d) <u>Federico IV</u> (2:13cv661) (common law negligence)

(e) Counts I and II of <u>Federico V</u> (2:14cv178) (common law negligence)

(f) Count I of <u>Federico I</u> (2:12cv80) (violation of the VRLTA)

(g) Count II of <u>Federico I</u> (2:12cv80) (breach of lease)

(3) Defendants' Motion for Summary Judgment, ECF No. 427, is **DENIED** in part with respect to the following negligence *per se* claims; therefore the following counts **REMAIN**:

(a) Count V of <u>Federico I</u> (2:12cv80)

(b) Count III of <u>Federico II</u> (2:12cv596)

(c) Count III of <u>Federico V</u> (2:14cv178)

(4) Defendant Lincoln Property Company is **DISMISSED** from cases 2:12cv596 and 2:14cv178.

(5) Defendant Lincoln Military Housing is **DISMISSED** from cases 2:12cv80, 2:12cv596, and 2:14cv178.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
August 31, 2015

38